RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

    *v.*

TAWSIF MOHAMMED TAJWAR,

        *Defendant-Appellant*.

No. 24-5085

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:22-cr-00092-5—Danny C. Reeves, District Judge.

Decided and Filed:  February 17, 2026

Before:  STRANCH, BUSH, and READLER, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:**  Bradley Clark, SUHRE & ASSOCIATES, Lexington, Kentucky, for Appellant. Brittany Dunn-Pirio, Charles P. Wisdom Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

READLER, J., delivered the opinion of the court in which BUSH, J., concurred. STRANCH, J. (pp. 10–12), delivered a separate opinion concurring in the judgment.

─────────────

## OPINION

─────────────

READLER, Circuit Judge.  Tawsif Mohammed Tajwar was sentenced to serve 90 months in prison due to his conviction for money laundering.  Tajwar believed that later developments at the Sentencing Commission gave him a basis to request a retroactive sentence reduction, which he did.  The district court denied his request, concluding that Tajwar's possession of a firearm in

connection with his money laundering offenses made him ineligible for relief.  Seeing no error in the district court's holding, we affirm.

## I.

Tawsif Tajwar came to the United States from Bangladesh as a teenager.  Over time, he became entangled in a transnational drug trafficking conspiracy.  The conspiracy operated through a triangular arrangement of sorts.  For the first leg of the triangle, Chinese manufacturers synthesized the precursor chemicals used to make fentanyl and, in turn, shipped those chemicals to Mexico, where cartels completed the production process.  From there, as part of the second leg, drug traffickers smuggled the finished product from Mexico into the United States, where it was sold for profit.  Money launderers like Tajwar made up the third leg of the triangle.  From his home in Michigan, Tajwar would drive around the country collecting bulk sums of cash earned through selling drugs.  Upon returning to Michigan with those proceeds, Tajwar then laundered the sums through his front business, iCash4Phones.  As orchestrated by Tajwar, iCash4Phones purchased used cell phones with the illicit cash for shipping to his Chinese contact, who accepted the phones as payment for the precursor chemicals, the original leg of the triangle.  Tajwar's money laundering, in other words, helped maintain the triangular drug trade.

Eventually, Tajwar's fortunes would turn.  Along with his brother, Israk, Tajwar drove a rented van to Lexington, Kentucky, to pick up cash as payment for a previous phone shipment.  Unbeknownst to Tajwar, the two co-conspirators delivering the money to him were under surveillance by law enforcement as part of an investigation into the conspiracy's Kentucky-based money laundering operation.  Law enforcement followed the pair as they drove to an area of town known for laundering activity.  The officers observed Tajwar's van pull into the meeting place.  One of the co-conspirators exited his vehicle and, after verifying billing information with Tajwar, placed two bags in the back of the van.

Officers conducted a traffic stop of Tajwar's vehicle later that day.  Visible in plain view to the officers were the two bags lying behind the driver's seat.  Officers then searched the vehicle.  Inside the bags, the officers found nearly $200,000 in cash.  In the van's third row of seats, officers discovered a gun box holding an unloaded firearm and a loaded magazine.  Tajwar

later admitted that the money likely came from drugs.  As for the gun, Tajwar stated that he brought it for protection, as he had done for his previous pickups as well.  Of particular importance, Tajwar added that he felt the need for protection given the large amount of cash he was transporting.

Tajwar was subsequently convicted of money laundering and conspiracy to launder money.  The district court sentenced him to 90 months in prison and three years of supervised release.  Tajwar unsuccessfully appealed his conviction and sentence.  *See Tajwar v. United States*, No. 23-5711, 2025 WL 593679 (6th Cir. Feb. 24, 2025), *cert. denied*, --- S. Ct. ---, 2025 WL 2824172 (Oct. 6, 2025).

During the pendency of that appeal, a potentially important development occurred at the U.S. Sentencing Commission:  the addition of § 4C1.1 to the Sentencing Guidelines.  The new provision instructed that an offender with no criminal history points is entitled to a two-level decrease to his overall offense level, subject to a series of exceptions.  *See* U.S. Sent'g Guidelines Manual § 4C.1.1(a) (U.S. Sent'g Comm'n 2025).  As the Sentencing Commission gave that amendment retroactive effect, Tajwar moved the district court to reduce his sentence in accordance with § 4C1.1.  The district court, however, denied Tajwar's motion.  Citing the gun discovered in Tajwar's vehicle, the court found that Tajwar fell under § 4C1.1(a)(7)'s exception for defendants who possessed a firearm "in connection with" their offense, rendering him ineligible for the two-level decrease.  Tajwar now appeals that determination.

II.

The district court employs a two-step inquiry to assess whether a defendant is entitled to a sentence reduction based on a retroactive amendment to the Sentencing Guidelines.  *United States v. Hanson*, 124 F.4th 1013, 1016 (6th Cir. 2025).  First, the court determines whether the defendant in fact qualifies for a reduced sentence under the Guidelines.  *Id.* (citing U.S. Sent'g Guidelines Manual § 1B1.10); *see* U.S. Sent'g Guidelines Manual § 1B1.10(a)(2)(A) (requiring amendment to be "applicable to the defendant").  If the defendant is in fact eligible, the court then considers whether to grant a reduced sentence based on the sentencing factors listed in 18 U.S.C. § 3553(a).  *Id.*

A.  Tajwar challenges the district court's threshold conclusion that Tajwar was ineligible for a reduced sentence under the amended guideline provision because he "possess[ed] . . . a firearm . . . in connection with the offense[s]."  U.S. Sent'g Guidelines Manual § 4C1.1(a)(7). To his mind, because he neither used nor needed to use his gun when committing the offenses, his possession of the weapon was merely incidental.  On that issue, we review the district court's legal determinations de novo and its factual findings for clear error.  *Hanson*, 124 F.4th at 1016 (citing *United States v. Curry*, 568 F.3d 597, 604 (6th Cir. 2009); *United States v. May*, 568 F.3d 597, 604 (6th Cir. 2009)).  As to "fact-specific" issues, such as "whether a nexus between a firearm and a felony exists," we accord "due deference" to the district court's application of the Guidelines to the facts.  *United States v. Crump*, 65 F.4th 287, 300 (6th Cir. 2023) (citation modified).

We have not previously interpreted § 4C1.1(a)(7)'s "in connection with" clause.  So, as with other codified law, to do so we start with the provision's text.  The phrase "in connection with" sees frequent use in statutory language, and courts widely understand it to "bear a broad interpretation."  *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) (citation modified); *see, e.g.*, *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 307 (6th Cir. 2024).  After all, the phrase is synonymous with equally generous language such as "relating to" or "associated with."  *See Firexo*, 99 F.4th at 307; *Aldridge v. Regions Bank*, 144 F.4th 828, 838–39 (6th Cir. 2025).  At the least, "in connection with" demands a minimal, if not "indeterminate," degree of connection to the crime at issue.  *Mont*, 139 S. Ct. at 1832.

Understandably, that language, standing alone, may be susceptible to differing readings. *Maracich v. Spears*, 570 U.S. 48, 60 (2013).  That said, "other provisions" of the Guidelines firm up our understanding of this provision's meaning.  *Id.* (construing "in connection with" using "statutory framework").  In particular, both parties direct our attention to § 2K2.1(b)(7) (formerly § 2K2.1(b)(6)), which allows for a sentencing enhancement where a defendant likewise possesses a firearm "in connection with" another felony.  Because we "give consistent meaning to terms throughout the Guidelines," *United States v. Pembrook*, 609 F.3d 381, 386 (6th Cir. 2010) (citation modified), we look to our existing § 2K2.1(b)(7) case law for further guidance.

Addressing that Guidelines provision, we have said that "[t]he burden to show a nexus between the firearm and the other felony is not onerous." *United States v. Henry*, 819 F.3d 856, 868 (6th Cir. 2016) (citation modified). It is enough that the "firearm 'facilitated . . . or had the potential of facilitating' the other offense." *Id.* (quoting U.S. Sent'g Guidelines Manual § 2K2.1 cmt. n.14(A)). Although possession of the firearm cannot be "merely coincidental," *United States v. Angel*, 576 F.3d 318, 321 (6th Cir. 2009), the requisite nexus exists so long as the firearm "served some purpose in relation to [an]other offense, such as emboldening the defendant in committing it," *Henry*, 819 F.3d at 868 (citation modified).

For drug-related offenses, we often infer that a defendant's firearm could or would "be used to protect . . . drugs or otherwise facilitate a drug transaction" when the defendant keeps the weapon close to his drugs or drug paraphernalia. *Angel*, 576 F.3d at 321 (citation modified); *see, e.g.*, *James v. United States*, 217 F. App'x 431, 438 (6th Cir. 2007) (finding "in connection with" element met where a traffic stop uncovered a gun and drugs "next to each other hidden under the same car seat"); *United States v. Berkey*, 406 F. App'x 938, 938–40 (6th Cir. 2011) (similar). (Although Tajwar did not personally deal drugs, he handled the proceeds earned from dealing drugs, making this a drug-related case. *See United States v. Garcia*, 834 F. App'x 134, 142 (6th Cir. 2020) (citing cases) ("[M]oney laundering is an act integrally related to the success of a conspiracy to distribute drugs."); *see also United States v. McKinley*, 735 F. App'x 871, 872, 874 (6th Cir. 2018) (finding "in connection with" met under § 4B1.4(b)(3)(A) where defendant was found carrying drugs and "drug-related" cash on him while keeping "a handgun under the driver's seat").) The logic, of course, is that drug-related offenses are risky in nature, and those involved in the trade all too often use firearms to protect themselves and their product. *See United States v. Coleman*, 627 F.3d 205, 212 (6th Cir. 2010). Put another way, firearms "embolden" criminals, thereby "facilitat[ing]" their criminal acts. *Id.*

With that in mind, did Tajwar possess a firearm "in connection with" his money laundering offenses? By all accounts, yes. As part of the conspiracy, Tajwar drove to various cities around the country picking up drug money that he would then transport and launder. Tajwar brought his gun to each one of these courier runs. No different than his previous excursions, Tajwar kept the gun in the car as he drove to the meeting in Lexington. Once there,

Tajwar remained in his van while co-conspirators placed two bags of drug money totaling nearly $200,000 in the back of the vehicle. When officers later conducted a traffic stop of the van, they found the bags placed behind the driver's seat. And in the van's third row of seats, they found the gun box. Inside was an unloaded firearm, which Tajwar admitted belonged to him, as well as a loaded magazine. The "close proximity" between Tajwar's gun and the drug money along with Tajwar's "easy access" to the weapon should he need to protect those monies were "indicative of a connection" between the gun and Tajwar's money laundering activities. *Angel*, 576 F.3d at 321 (citation modified). That alone suffices to support the district court's conclusion that Tajwar brought the gun with him to facilitate his pickup and transport of the drug proceeds. *See Berkey*, 406 F. App'x at 940 (citing *id.*) ("[Defendant] brought the gun 'along' precisely so that he would feel safer carrying . . . drugs in public."); *James*, 217 F. App'x at 438.

Were there any doubt on that score, Tajwar's words erased it. When asked why he brought the gun, Tajwar told officers that he had it with him for protection. He further explained that he needed protection due to the large sum of money he would be transporting. Indeed, Tajwar even admits in his brief that as he and his brother approached the meeting place, he assured his brother that he had a gun with him "for safety." Appellant Br. 16 (citing Sent'g Tr., R. 377, PageID 2322). By Tajwar's own statements, in other words, his gun "facilitated" or "had the potential to facilitate" his criminal activity by "emboldening" him to engage in such conduct. *Angel*, 576 F.3d at 321–22 (citation modified); *see Berkey*, 406 F. App'x at 939–40.

Looking across the circuit courts, our conclusion is not an outlier. Other circuits applying § 4C1.1(a)(7) have employed similar reasoning in denying sentence reductions. *See, e.g.*, *United States v. Vargas*, No. 24-50362, 2025 WL 416997, at *2 (5th Cir. Feb. 6, 2025) (per curiam) (defendant admittedly "possessed the firearms found in her vehicle for protection during the transportation and sale of the controlled substance" (citation modified)); *United States v. Castillo-Pena*, No. 24-4257, 2025 WL 2400440, at *1 (9th Cir. Aug. 19, 2025) (defendant "possessed the firearm as part of [a] planned transaction"); *United States v. Bernal Salazar*, No. 24-6121, 2024 WL 4603965, at *2, *4 (10th Cir. Oct. 29, 2024) (defendant's firearm was found "in the house where defendant was residing, along with methamphetamine and U.S. currency"); *United States v. Spencer*, No. 24-10318, 2025 WL 691682, at *5 (11th Cir. Mar. 4, 2025) ("[T]he

firearms were near narcotics and drug paraphernalia"). Against this backdrop, we agree with the district court that Tajwar possessed a firearm in connection with his money laundering offenses, making him ineligible for § 4C1.1's adjustment for zero-point offenders.

B. Tajwar resists this conclusion in a few ways. He begins by emphasizing the fact that he carried out his offenses without "ever touching his gun." Appellant Br. 16–17. But that is not the benchmark. Rather, we ask whether the gun "facilitated or had the *potential* to facilitate" the crime. *Angel*, F.3d at 321–22 (emphasis added). And here, Tajwar admits he brought the gun because he thought he may have to use it to protect the money that he was transporting. That a confrontation ultimately never came to pass does not sever the connection between the gun and the crime. Nor does it change the fact that the gun could have helped Tajwar carry out the money laundering by preventing bad actors from stealing the laundered funds.

More substantially, Tajwar insists he could not have possessed the firearm with his laundering offenses in mind because the weapon was not "readily accessible" during the cash pickup in Lexington. Appellant Br. 14. True, Tajwar sat in the driver's seat during the exchange while his gun was in a case in the third row of the van, with the ammunition kept to the side. But the particulars of this exchange are beside the point when Tajwar's criminal conduct included both his other pickups and his transportation of the drug proceeds—all done while possessing his gun. And even looking solely at the events in Lexington, these facts still do not overcome the inference that the weapon was there for protection during Tajwar's criminal acts. Indeed, we need not guess at Tajwar's intentions when he admits he brought the gun for protection while carrying out the offenses. And so long as Tajwar's possession of the firearm—in whatever manner he chose to keep the weapon—emboldened him, that was enough to facilitate the crime.

At any rate, Tajwar's placement of the gun supports the district court's nexus finding. Recall that while the gun was not directly adjacent to Tajwar, it was placed just a few feet from the money procured as part of the drug trade. And the presence of Tajwar, the gun, and the proceeds within the vehicle on its own suggests a nexus between the weapon and the crime. *See Berkey*, 406 F. App'x at 938–40 (finding nexus where a traffic stop revealed drugs in the driver's pocket and a gun "lying on the back seat behind him")*; see also United States v. Preston*, No. 24-5354, 2025 WL 608535, at *2 (6th Cir. Feb. 25, 2025) (holding that we do not require

"immediate proximity" between the weapon and the contraband (citing *United States v. Taylor*, 648 F.3d 417, 432 (6th Cir. 2011))). That the gun box may have been locked, we have explained, is of no moment. *See United States v. Ennenga*, 263 F.3d 499, 503 (6th Cir. 2001) (finding "firearm[s] had some emboldening role in defendant's felonious conduct" even where "the guns were all found in [a] locker," with a fastened lock, away from the drugs (citation modified)). Nor does it make any difference that Tajwar stored the ammunition in the same container as the gun but left the gun unloaded. The proximity between the two had Tajwar "one step closer to having a fully-loaded firearm," which fairly demonstrates the required nexus. *See Coleman*, 627 F.3d at 212 (finding possession of ammunition sans firearm sufficient). At day's end, Tajwar possessed the gun "in connection with" his offenses even if he did not have it ready to fire on a hair trigger.

Disputing that conclusion, Tajwar portrays his carrying a gun as merely for a "personal, defensive purpose unrelated to executing the crime." Appellant Br. 14–15. But Tajwar's own statements belie that assertion. Tajwar told officers he brought the gun specifically because he was picking up the money—funds which, as the district court found, Tajwar knew had come from drugs. He also told his brother about the gun as they approached the meeting point, further reflecting Tajwar's tying the weapon to his illegal actions. It may be, as Tajwar suggests, that his possession of the firearm could have been "consistent with self-defense . . . in other situations." *Castillo-Pena*, 2025 WL 2400440, at *1 (citation modified). But that possibility fails to show that his firearm possession here was not still "in connection with" with his money laundering crimes. *See id.* Relatedly, Tajwar claims that he brought the gun to protect against "third-party threats," not to secure the drug proceeds from his co-conspirators. Appellant Br. 15. Yet Tajwar nowhere explains how this distinction matters. If anything, this argument all but concedes that Tajwar kept the gun to ensure his safe transportation of the drug money in fulfillment of his role as the conspiracy's money courier.

Tajwar lastly claims that the firearm did not embolden him to commit his offenses because the government presented no evidence that Tajwar "would have refused the money pickup absent a firearm." Appellant Br. 16. But that assertion ignores the fact that § 4C1.1(a)(7) broadly encompasses any firearm possession "in connection" with the offense. The firearm, in

other words, need not be a but-for cause of the crime.  And here, the district court had more than enough evidence to conclude that Tajwar's gun "had the potential" to facilitate his offenses, including by "emboldening" Tajwar.  *Henry*, 819 F.3d at 868; *see Crump*, 65 F.4th at 300.  All told, the district court did not err in deeming Tajwar ineligible for a retroactive sentencing reduction.

*          *          *          *          *

We affirm.

————————————

**CONCURRENCE**

————————————

JANE B. STRANCH, Circuit Judge, concurring in the judgment.  I concur in the judgment in this case because it leads to the correct holding that Tajwar is ineligible for a retroactive sentencing reduction under § 4C1.1(a)(7).  I write separately to analyze this case under the legal standards in our circuit that govern the factual setting presented here.

As the majority opinion notes, our precedent interpreting the "in connection with" language of § 2K2.1(b)(7)(B) provides valuable guidance in applying the "in connection with" language of § 4C1.1(a)(7).  A district court should not apply the § 4C1.1(a)(7) reduction "if the government establishes, by a preponderance of the evidence, a nexus between the firearm" and the offense.  *United States v. Angel*, 576 F.3d 318, 321 (6th Cir. 2009) (citation modified).  Our circuit precedent holds that, in the context of § 2K2.1(b)(7)(B), the test governing what is necessary to show the required nexus differs in two specific circumstances.

One circumstance is in the presence of a drug trafficking offense.  *See* U.S.S.G. § 2K2.1, cmt. n.13(B)(ii).  The Sentencing Commission clarified that "in the case of a drug trafficking offense" the requisite nexus is established when "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia."  *Id*.

The other circumstance is when the firearm is found on "premises" with facts that satisfy the fortress theory as adopted by this circuit.  *Angel*, 576 F.3d at 321.  Under the fortress theory, "a sufficient connection is established 'if it reasonably appears that the firearms found on the *premises* controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction.'"  *Id.* (citation omitted) (emphasis added).  The word "premises" is defined in Black's Law Dictionary as "a house or building, along with its grounds."  PREMISES, Black's Law Dictionary (12th ed. 2024).

Outside these two specific contexts, a sufficient nexus is shown "only if the government can establish that the firearm actually or potentially *facilitated*" the offense.  *United States v. Shields*, 664 F.3d 1040, 1045 (6th Cir. 2011) (citation omitted).  While proximity may be

dispositive for drug trafficking offenses and carry great weight where the case involves defendant's premises and firearms under our fortress theory, in other contexts proximity is merely "indicative" of a firearms' actual or potential facilitation. *Angel*, 576 F.3d at 321. Put differently, the nexus between a firearm and an offense is "not automatic whenever a firearm and drugs are found together." *United States v. Berkey*, 406 F. App'x 938, 940 (6th Cir. 2011).

Here officers conducted a traffic stop of the rented minivan that Tajwar was driving. A search of the van revealed two bags of U.S. currency behind the driver's seat and a gun box containing an unloaded firearm next to a magazine in the van's third row of seats. A jury convicted Tajwar of (1) conspiracy to commit money laundering and (2) promotional money laundering.

Does this case fall within the first context? Although the record indicates that Tajwar was involved in a transnational drug trafficking conspiracy, he had only drug *proceeds* in the van, not the necessary "drugs, drug-manufacturing materials, or drug paraphernalia." *See* U.S.S.G. § 2K2.1, cmt. n.13(B)(ii). Even if his money laundering offenses did constitute "drug trafficking offense[s]," which need not be decided, the first circumstance is not applicable because proceeds are not "drugs, drug-manufacturing materials, or drug paraphernalia." *See id*. So, proximity is not dispositive.

Regarding the second context, the firearm was found in a van driving on public roads—no fortress or premises were involved (no home, motel room, stash house, etc.). The fortress theory therefore does not apply.

Our circuit's abundant precedent regarding actual or potential facilitation does apply. This court's most instructive case is *Berkey*, in which the defendant, pulled over for speeding, was found with drugs on his person and a pipe and firearm in his car. 406 F. App'x at 938, 940. Analyzing whether there was actual or potential facilitation under § 2K2.1(b)(7)(B), *Berkey* held that the defendant's "own testimony supplied all of the facts" needed to establish that the firearm potentially facilitated the separate offense (drug possession) because the defendant claimed ownership of the drugs and the firearm, had used the drugs in the car, and had the drugs and a pipe in one pocket and the gun in another when he left his house to get into the car. *Id*.

Employing that analysis here, Tajwar's firearm had the potential to facilitate his money laundering offense, as proven by his statements that he brought the gun each time he picked up the money and that the gun was for his protection while moving large sums of money. Application of the legal standard from the factually similar *Berkey* case leads to the correct result, affirmance. *See id.*

Applying our core legal standard also aligns with the Fifth Circuit case, *United States v. Vargas*, No. 24-50362, 2025 WL 416997 (5th Cir. Feb. 6, 2025). There, a legally owned firearm was found inside a vehicle used to transport drugs, so the court analyzed § 4C1.1(a)(7) by simply focusing on the defendant's admission in her plea agreement that she owned the firearm and used it to protect the drugs during transport. *Id.* at *2–3. So too here.

Our governing facilitation law is both adequate and appropriate for resolution of this case. It shows that Tajwar possessed a firearm "in connection with" his offense and I would affirm the district court on that basis.